**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| *In re* | Case No. 4:22-cv-3191 |
| | |
| *Data Security Cases Against NELNET SERVICING, LLC* | The Honorable John M. Gerrard, U.S.D.J. |
| | The Honorable Jacqueline M. DeLuca, U.S.M.J. |
| | ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO INTERVENORS'
RENEWED MOTION TO INTERVENE**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................... ii

I.    INTRODUCTION ..................................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................................... 3

   A.   MDL Proceedings & Case Organization ........................................................ 3

   B.   The Settlement Negotiations ............................................................................ 6

   C.   Intervenors History of Engaging in True Reverse Auctions ........................... 9

   D.   The Notice Plan ............................................................................................. 12

   E.   The Work of Interim Class Counsel .............................................................. 13

III.  LEGAL ARGUMENT ........................................................................................... 14

   A.   Intervention is Not the Proper Vehicle to Object to the Settlement ............... 14

   B.   Intervenors' Challenge to the Settlement Amount is Meritless ..................... 16

   C.   The Notice Plan Adequately Informs Class Members about the Settlement ................... 21

   D.   Intervenors Do Not Present Any Basis to Replace Interim Class Counsel ...................... 23

IV.  CONCLUSION ..................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**

*Cullan & Cullan LLC v. M-Qube, Inc.*,
    No. 8:13-cv-172, 2016 WL 5394684 (D. Neb. Sept. 27, 2016) ................................................. 16

*Doe v. Regents of the Univ. California*,
    672 F. Supp. 3d 813 (N.D. Cal. 2023) ................................................. 20

*E.E.O.C. v. Hibbing Taconite Co.*,
    266 F.R.D. 260 (D. Minn. 2009) ................................................. 19

*Fraley v. Facebook, Inc.*,
    966 F. Supp. 2d 939 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th
    Cir. 2016) ................................................. 20

*Grunin v. Int'l House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ................................................. 21

*Harvey v. Morgan Stanley Smith Barney LLC*,
    No. 18-cv-02835 (WHO), 2019 WL 9441672 (N.D. Cal. Sept. 5, 2019), *aff'd*, No. 19-16955,
    2022 WL 3359174 (9th Cir. Aug. 15, 2022) ................................................. 22

*Hibler v. Santander Consumer USA, Inc.*,
    No. 13-1354, 2013 WL 12137716 (C.D. Cal. Nov. 21, 2013) ................................................. 17

*In re Methyl Methacrylate (MMA) Antitrust Litig.*,
    435 F. Supp. 2d 1345 (J.P.M.L. 2006) ................................................. 4

*In re MOVEit Customer Data Sec. Breach Litig.*,
    699 F. Supp. 3d 1402 (J.P.M.L. 2023) ................................................. 9

*In re Nelnet Servicing, LLC, Customer Data Sec. Breach Litig.*,
    648 F. Supp.3d 1377 (J.P.M.L. 2022) ................................................. 4

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994) ................................................. 20

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
    396 F.3d 922 (8th Cir. 2005) ................................................. 16

*Jenkins by Jenkins v. State of Mo.*,
    78 F.3d 1270 (8th Cir. 1996) ................................................. 25

*Keil v. Lopez*,
    862 F.3d 685 (8th Cir. 2017) ................................................. 18

*Kirby v. Payless ShoeSource, Inc.*,
   No. 06-cv-11853 (GAO), 2008 WL 11511501 (D. Mass. Sept. 5, 2008)................................. 19

*Lechner v. Mutual of Omaha Ins. Co.*,
   No. 8:18-cv-22, 2021 WL 424421 (D. Neb. Feb. 8, 2021) ...................................................... 18

*Lewis-Ramsey v. Evangelical Lutheran Good Samaritan Soc'y*,
   No. 3:16-cv-00026, 2017 WL 821656 (S.D. Iowa Jan. 10, 2017) ........................................... 23

*Little v. Shell Expl. & Prod. Co.*,
   No. CV H-07-871, 2017 WL 4742917 (S.D. Tex. Aug. 18, 2017)........................................... 18

*Looney v. Chesapeake Energy Corp.*,
   No. 2:15-cv-02108, 2016 WL 7638467 (W.D. Ark. Sept. 23, 2016)....................................... 15

*Pamida, Inc. v. E.S. Originals, Inc.*,
   281 F.3d 726 (8th Cir. 2002)................................................................................................... 19

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999)................................................................................................. 21

*Puget Soundkeeper All. v. Rainier Petroleum Corp.*,
   No. C14-0829JLR, 2017 WL 6515970 (W.D. Wash. Dec. 19, 2017) ..................................... 18

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
   944 F.3d 1035 (9th Cir. 2019)................................................................................................. 23

*Swinton v. Squaretrade, Inc.*,
   960 F.3d 1001 (8th Cir. 2020)................................................................................................... 7

*Thompson v. Edward D. Jones & Co.*,
   992 F.2d 187 (8th Cir. 1993)................................................................................................... 22

*United States v. Cote*,
   456 F.2d 142 (8th Cir. 1972)................................................................................................... 18

## Rules

Fed. R. Civ. P. 23(c)(2)................................................................................................... 2, 12, 21
Fed. R. Civ. P. 23(e)(5)............................................................................................................ 14
Fed. R. Civ. P. 24..................................................................................................................... 14

## Treatises

Manual for Complex Litigation, § 21.11 (4th ed.)........................................................................ 1
William B. Rubenstein et al., Newberg on Class Actions § 13:7 (6th ed.)................................... 10

## I.    __INTRODUCTION__

This is Intervenors' second attempt at hijacking this case. Now joined by their friends from the Losing Leadership Group[1] (who are very, very concerned) they, yet again, accuse Interim Class Counsel of colluding with Defendants in hopes of taking over leadership of this case. But their renewed motion, for all its buzzword and bombastic language, is devoid of any substance. There is no actual evidence of collusion any anywhere. No documents. No quotes from emails or phone calls. No pictures from social media. Nothing. Intervenors' entire conceit is that the Settlement amount—i.e., the $10 million recovered for the Settlement Class—is "conclusive evidence" that Interim Class Counsel engaged in a "reverse auction,"[2] because had the Court appointed the Losing Leadership Group instead, they believe they may have possibly been able to settle the case for more.  If that sounds circular, self-serving, speculative, and irrelevant, that's because it is.

The Court can dispose of Intervenors' entire motion on this basis alone because these unsupported claims fall well short of the standard this Court established for renewal in its First Intervention Order. *See* ECF No. 98. After rejecting Intervenors' collusion narrative for their failure to "submit or point to any evidence," (*id*. at 5), the Court held that Intervenors could file a

---

[1] This includes Gary M. Klinger and David K. Lietz of Milberg Coleman Bryson Phillips Grossman, PLLC (counsel for the plaintiff in the Case No. 4:22-cv-03181), Lori Feldman of George Feldman McDonald (counsel for the plaintiff in Case No. 4:22-cv-03186), John Yanchunis of Morgan & Morgan (counsel for the plaintiff in Case No. 4:22-cv-03184), Terence R. Coates of Markovits Stock DeMarco (counsel for the plaintiff in Case No. 4:22-cv-03181) and Maureen Brady of McShane and Brady (counsel for the plaintiffs in Case No. 4:22-cv-03203). *See* Renewed Motion to Intervene ("Mot.") at. 1, n. 1, ECF No. 117.

[2] The use of this term makes little sense in context since Interim Class Counsel were the only ones appointed to lead this case and negotiate a settlement with Defendants, such that there was no one else to "auction" the case with. *See* Leadership Appointment Order, ECF No. 43 ("designation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement.") (quoting Manual for Complex Litigation, § 21.11 (4th ed.)).

1

new motion if, and only if, "new facts" developed that "prove Plaintiffs do not adequately represent" their interests. *Id.* at 8. Anything else would be wasting the Court's time. *Id.* Intervenors apparently ignored this directive as their Motion confirms there is nothing "new" besides their newly contrived theory that the Settlement itself proves collusion. This is not evidence of anything.

Intervenors' collateral attacks on Notice Plan do not save their motion. The Notice here was carefully crafted in collaboration with A.B. Data, Ltd. ("A.B. Data"), the Claims Administrator, to meet each of the requirements outlined in Fed. R. Civ. P. 23(c)(2).[3] Intervenors' claim the Notice Plan is nonetheless deficient because it does not provide enough information about the status of the case in Oklahoma for Settlement Class Members to determine which case better represents their interests. Mot. at 7-8. This is nonsense. The purpose of class notice is to apprise Settlement Class Members of their rights under the Settlement. It is not a poll about which case is better. Larding the Notice with irrelevant information about the discovery or procedural history in Oklahoma adds no value, and if anything, would mislead Settlement Class Members in to believing they have options they do not. Courts have rejected similar demands for extraneous information about parallel actions on this basis before. Intervenors, tellingly, do not cite a single case adopting their approach.

Intervenors' and the Losing Leadership Group's remaining criticisms of Interim Class Counsel and the work they performed, or their strategy for litigating the case, are equally meritless. The results obtained here are in line with other settlements in data breach cases nationwide, including those entered by Intervenors and members of the Losing Leadership Group. *See* Table 1, below. The feigned disappointment expressed in Intervenors' motion is not substantive, it

---

[3] *See* September 24, 2024 Declaration of Justin Parks of A.B. Data ("Parks Decl."), ¶¶ 7-12, attached as Exhibit 1 to the September 25, 2024 Declaration of Christian Levis ("Levis Decl."), filed herewith.

simply reflects the fact that they and their friends are mad they were not the ones to lead this case.[4] That is not a valid basis to intervene in the action under the Court's First Intervention Order. It is not a valid basis to object to the Settlement. And it is certainly not a valid basis to deny preliminary approval. The Court should deny this motion with prejudice.

## II.    FACTUAL BACKGROUND

The Court granted Intervenors a limited right to renew their motion if new evidence proving that Interim Class Counsel failed to represent their interest arose. *See* First Intervention Order at 8. Intervenors cannot meet this standard. The only "new" development since Intervenors' March 12, 2024 motion is that the Settlement terms are now public. While Intervenors try to spin those facts into proof of collusion or other misconduct by Interim Class Counsel, their arguments either repackage claims the Court already rejected, or rely exclusively on speculation about what could have happened if they had been appointed to leadership. Neither are sufficient for this motion.

### A.  MDL Proceedings & Case Organization

Intervenors accuse Interim Class Counsel of misusing 28 U.S.C. § 1407 to "delay[]" the case and "bolster [their] chances of serving as lead counsel." Mot. at 2-3. In truth, at the time Interim Class Counsel petitioned the J.P.M.L to centralize all actions arising from the Nelnet Data Breach in this District there were already 17 cases concerning this same breach pending in three separate federal districts. MDL No. 3053, ECF No. 1-1.[5] The goal of consolidating all cases in a single location was to avoid duplication, inconsistences, and other issues that traditionally arise

---

[4] The fact that Intervenors felt compelled to include a section in their motion trying to explain how they are not "a group of aggrieved attorneys seeking to intervene" actually proves this point. Mot. at 8.

[5] Attached as Exhibit 2 to the Levis Decl.

when multiple actions separately litigate claims relating to the same set of facts in parallel. *See In re Methyl Methacrylate (MMA) Antitrust Litig.*, 435 F. Supp. 2d 1345, 1347 (J.P.M.L. 2006) (J.P.M.L. centralization is designed to "eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to class certification matters), and conserve the resources of the parties, their counsel and the judiciary.").

Following this motion, two things happened that impacted the J.P.M.L.'s December 13 decision. First, all but one of the cases remaining outside this District voluntarily transferred here. *See In re Nelnet Servicing, LLC, Customer Data Sec. Breach Litig.*, 648 F. Supp.3d 1377, 1378 (J.P.M.L. 2022) ("Here, only one of the twenty-two actions in this litigation (including the actions noticed by the parties as related) is pending outside the District of Nebraska. Three actions initially filed in other districts have been transferred to the District of Nebraska through agreed transfer motions under 28 U.S.C. § 1404.").[6] The only case not to ultimately transfer to this District was the *Carr* Action, which Intervenors' counsel initially filed in Oklahoma state court before it was removed to the Western District Oklahoma on January 30, 2023. *See Carr, et al. v. Oklahoma Student Loan Authority & Nelnet Servicing, LLC*, No. 5:23-cv-00099, ECF No. 1 (W.D. Okla.) ("*Carr*"). Second, at J.P.M.L. hearing in November 2022, Intervenors' counsel advocated *against* Section 1407 transfer and consolidation on the grounds that it was unnecessary because plaintiffs could voluntarily organize their cases in Nebraska, as demonstrated by several recent voluntary transfers.

> There's no need for an MDL here. ***All the cases can go to Nebraska. They were all filed there***. … The plaintiffs' counsel spent a lot of time self-organizing. The court should encourage that rather than running to the MDL. … Oklahoma will get implicated in the case through the Oklahoma Student Loan Authority, the venue issues

---

[6] The *Kohrell* Action voluntarily transferred their case here from the Eastern District of Tennessee on December 20, 2022. *Kohrell* Action, No. 4:22-cv-03267, ECF Nos. 34-35 (D. Neb.).

bringing the case in Nebraska. If you don't want to send it to Nebraska, send it to Oklahoma. We're willing to go with it.

December 1, 2022 JPML Hr'g Tr. at 9:7-23, MDL No. 3053, ECF No. 61[7] (emphasis added).

Mr. Federman's statements were tactically misleading as he had no intention of voluntarily transferring the *Carr* Action to this District. As Mr. Federman does in many cases, he filed the *Carr* Action in state court after the parties here submitted leadership briefs, as a hedge in the event he was not appointed to leadership.[8] This is also reflected by his repeated refusal of Interim Class Counsel's requests that he transfer the action to Nebraska and jointly prosecute the case. *See* April 4, 2024 Declaration of Christian Levis at ¶¶ 4-5, ECF No. 92-2; *see also* June 12, 2024 Declaration of Christian Levis at ¶ 14, *Carr* Action, ECF No. 110-1.[9] ("Following the filing of my April 4, 2024 Declaration, I had additional telephone conversations with *Carr* plaintiffs' counsel. On April 15, 2024, I had a telephone conversation with *Carr* plaintiffs' counsel where I proposed that the *Carr* plaintiffs join [Plaintiffs'] prosecution of the consolidated action with us as interim co-lead class counsel and participate in the case on an equal basis.") (internal citations omitted). In fact, despite his statement to J.P.M.L. suggesting voluntary transfer and coordination, Mr. Federman was the only attorney in any case filed nationwide to resist transfer to this District. *See Carr* Action, Plaintiffs' Response in Opposition to Defendant Nelnet Servicing, LLC's Motion to Transfer Venue and/or Stay, ECF No. 32.

Intervenors will likely argue that this reluctance to transfer reflected sound judgment in the interest of the class given the *Carr* Action's swifter progress, and its position as a superior choice

---

[7] Attached as Exhibit 3 to Levis Decl.

[8] A recent example where Mr. Federman deployed this strategy in the *MOVEit* data breach is instructive and discussed in detail below. *See, infra,* Section II(c).

[9] Attached as Exhibit 4 to Levis Decl.

of forum due its jurisdiction over OSLA.[10] But this is pretext. In private, Mr. Federman has always been clear that he was concerned about one thing—his attorneys' fees—and was willing to transfer the case to this District despite the so-called "jurisdictional" issues and lack of progress he now extols, so long as Interim Class Counsel guaranteed him the percentage he demanded. *See* April 4, 2024 Declaration of Christian Levis at ¶ 6, ECF No. 92-2 ("At no point during any of our calls did Movants' Counsel express concerns about this Court's jurisdiction over claims against OSLA, its ability to approve a settlement involving OSLA, or Interim Class Counsel's adequacy to serve as counsel for the Class"); *see also* June 12, 2024 Declaration of Christian Levis at ¶ 14, *Carr* Action, ECF No. 110-1, attached as Exhibit 4 ("I had a telephone conversation with *Carr* plaintiffs' counsel where I proposed that the *Carr* plaintiffs join [Plaintiffs]' prosecution of the consolidated action with us as interim co-lead class counsel and participate in the case on an equal basis. *Carr* plaintiffs' counsel responded to our proposal on April 17, 2024, via telephone, rejecting this offer and demanding a disproportionate amount of fees."). There is no reason to doubt these representations. True to his word, when Interim Class Counsel refused to pay, Mr. Federman made good on his threat to create a "problem" for the case (*see* ECF No. 92-2 at ¶ 7)—as evidence by his serial attempts to intervene, attacks on Interim Class Counsel, and new effort to coordinate objections to the Settlement with members of the Losing Leadership Group.

### B.  The Settlement Negotiations

The primary justification for Intervenors renewed motion is their claim that: (1) if in charge, they would have settled this case for more than $10 million, and (2) this hypothetical, in

---

[10] In accordance with the Court's August 29, 2024 Order (ECF No. 115), Plaintiffs fully address Intervenors' jurisdictional arguments in their Reply submitted on September 24, 2024. *See* ECF No. 119.

turn, "conclusively" proves that Interim Class Counsel obtained the settlement currently before the Court through a reverse auction. Mot. at 1. Neither statement is true.

Intervenors' carefully worded statements about their initial secret meditation belie their claims about the anticipated, larger settlement. Noticeably absent from Intervenors' motion is any proof that Defendants made a concrete offer, whether in a term sheet or otherwise, to settle the same case plead here for more than $10 million. What Intervenors say is far squishier: "The proposed settlement Class Counsel offer for approval is less than the amount Defendants *indicated* they would settle the case for in November 2022." Mot. at 1-2 (emphasis in original). Counsel's perceptions about Defendants' *indications* are far from "conclusive evidence" of anything.[11] This is especially true given that Intervenors have attempted to use their early mediation as both a sword and a shield: relying on Defendants' "indications" to attack Interim Class Counsel while hiding the substance of their discussions under the guise of mediation privilege, such that their claims cannot be tested. Mot at 1-2.[12] The Court should reject such tactics out of hand.

Regardless, Intervenors still have not put forth any evidence of collusion since the Court rejected this argument. As the Court observed the last time:

> The Intervenors did not submit or point to any evidence indicating Plaintiffs colluded with Defendants (despite their conclusory statements speculating that such occurred). Plaintiffs did not include the Intervenors in settlement discussions with Defendants and OSLA but this is not evidence of collusion. [*Swinton v. Squaretrade, Inc.*, 960 F.3d 1001, 1006 (8th Cir. 2020)] ("[T]he Federal Rules do not require . . . that settlement discussions involve class members."). A review of the docket reveals Plaintiffs have diligently worked to

---

[11] There are nearly endless number of situations which can be interpreted as Defendants "*indicat[ing]*" they might pay more when, in fact, they would not. For example, counsel could read into Defendants' offers to project that they could obtain a certain result, even though it was never discussed, or they could misinterpret what the mediator relayed, or create projections that exceed the Defendants' authorization and were thus impossible.

[12] As explained in Part III.B., below, Intervenors have waived any claim of privilege over the mediation by relying on it as the basis for their motion.

progress the Nebraska action by filing an amended complaint after
consolidation, defending against a motion to dismiss, and
participating in two mediations.

First Intervention Order at 5. Nothing has changed. This is not surprising as Interim Class

Counsel's conduct has been the exact opposite of what you expect from a party trying to collude

with the Defendants this entire case. For instance, if as Intervenors claim, Interim Class Counsel

were truly unqualified and, in surprisingly perceptive recognition of their lack of qualification,

attempted to run off with Defendants in secret to sell out the class:

- Why would they waste over four months drafting a 160-page consolidated amended complaint with 33 causes of action and filing a 76-page opposition to Defendants' motion to dismiss, ECF Nos. 51, 73.

- Why would they bother requesting documents and information from Defendants to understand the root causes of the Data Breach, or data about the size and composition of the class? *See* August 24, 2024 Declaration of Christian Levis in Support of Plaintiffs' Motion For Preliminary Approval of at ¶ 34, ECF No. 110 ("Levis Preliminary Approval Decl.").

- Why would they waste time and money hiring a highly skilled mediator, reviewing documents, preparing mediation statements, and sitting through two full-day mediations? *See id.* at ¶¶ 33-35, 37-39.

- Why would they repeatedly try to organize the case in Nebraska, and reach out to Mr. Federman to see if he would voluntary transfer his case from Oklahoma to this district? *See* April 4, 2024 Declaration of Christian Levis at ¶¶ 4-10, ECF No. 92-2; *see also* June 12, 2024 Declaration of Christian Levis at ¶ 14, *Carr* Action, ECF No. 110-1.[13]

- Why would they invite Mr. Federman to participate in the global settlement negotiations to resolve the case? *Id.*

- Or propose that he join the leadership structure as an equal one-third co-lead to Lowey and SGT? *See* June 12, 2024 Declaration of Christian Levis at ¶ 14, *Carr* Action, ECF No. 110-1.

---

[13] Attached as Exhibit 4 to Levis Decl.

Intervenors omit each of these facts from their motion, and for good reason: any one would be enough to dispose of their brazen claims. Stacked together, they are insurmountable.

### C.  Intervenors History of Engaging in True Reverse Auctions

Contrast Interim Class Counsel's conduct with that of Mr. Federman in the *In re MOVEit Customer Data Sec. Breach Litig*., 699 F. Supp. 3d 1402 (J.P.M.L. 2023). *See* Exhibit 5 to the Levis Decl.[14] In *MOVEit*, hackers compromised a popular file transfer software tool estimated to have compromised the personally identifying information ("PII") of over 55 million people. *See In re MOVEit Customer Data Sec. Breach Litig.*, 699 F. Supp. 3d at 1405. At the time of transfer over 100 data breach cases were filed in 22 districts across the country against Ipswitch, Inc. (the developer of the tool) and its parent company Progress Software, along with dozens of companies that used the MOVEit software. *See In re MOVEit Customer Data Security Breach Litig*., MDL No. 3083 (docket generally). In October 2023, the J.P.M.L. centralized all cases nationwide for pretrial proceedings in the District of Massachusetts. *See In re MOVEit Customer Data Sec. Breach Litig.*, 699 F. Supp. 3d at 1407-08. Dozens of competing groups moved for leadership in the MDL.[15] Mr. Federman submitted three applications for appointment to leadership. *See In re MOVEit Customer Data Security Breach Litig*., MDL No. 3083, ECF Nos. 211 and 211-1, 463, and 466 and 466-1. Each was denied. *Id.* at ECF No. 649.

---

[14] *See* Show Cause Motion Brief, *In re MOVEit Customer Data Security Breach Litig*., MDL No. 3083, ECF No. 1150 (Plaintiffs' Memorandum of Law in Support of Emergency Motion for the Court to Issue a Show Cause Order Regarding the Failure of Defendant Paycom Payroll, LLC, Orrick, Herrington & Sutcliffe LLP, and Attorney William B. Federman to Comply With the Court's Case Management Orders).

[15] *See In re MOVEit Customer Data Security Breach Litig*., MDL No. 3083, ECF Nos. 154, 172-173, 211, 330, 333, 383-385, 392, 396, 400, 403, 405-406, 409-411, 413-415, 417-424, 426-428, 430-431, 433-435, 440-442, 444, 446-448, 451-454, 456, 458-464, 466-471.

That did not deter Mr. Federman from end-running the MDL. Deploying the same strategy used here, Mr. Federman initiated a state court action in Oklahoma against Paycom Payroll LLC, one of the defendants in the MDL. *See Johnson v. Paycom Payroll, LLC*, No. CJ-2023-4763 (Dist. Ct. Okla. Cnty. Aug. 22, 2023).[16] Despite being ordered to disclose any pending state court actions by the MDL court, Mr. Federman and Paycom's counsel concealed the *Johnson* Action from the MDL Court and court-appointed lead counsel while they secretly worked out a settlement releasing claims pending in the MDL. The total *guaranteed* settlement amount: $0. Mr. Federman sold the classes' claims as part of a claims-made deal[17] that guaranteed *no money* to the class, while netting him $275,000 in attorney's fees. *See* Settlement Agreement at ¶ 56, *Johnson v. Paycom Payroll, LLC*, attached to Decl. as Exhibit 6.

Lead counsel in the *MOVEit* MDL have since filed for an order to show cause enjoining the Paycom settlement and requiring Mr. Federman, Paycom, its attorneys and any other person acting in concert with Paycom to demonstrate why they should not be found in violation of MDL Orders for failing to notify the Court of the pending *Johnson* Action, and for filing the proposed

---

[16] The *Carr* Action also started as state court case in Oklahoma before Nelnet and OSLA removed it to federal court. *See Carr* Action, ECF No. 1.

[17] The term "claims-made" made means that the defendant commits no money up front and only pays class members who file claims up to a capped amount. *See* William B. Rubenstein et al., Newberg on Class Actions § 13:7 (6th ed.) (A claims made settlement "is a settlement that does not have a fixed settlement fund, but rather provides that the defendant will pay claims of class members who file them, usually up to some fixed ceiling."). Defendants like this structure because, historically, the average claims rate in consumer settlements (i.e., those involving individuals) is approximately 4% of eligible participants, so their exposure is almost certain to be lower than the maximum amount. *See* Federal Trade Commission, Consumers and Class Actions: A Retrospective and Analysis of
Settlement Campaigns, September 2019, at p. 11, *available at* https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf.

Paycom Settlement without prior notice to Lead Counsel or this Court. *See In re MOVEit Customer Data Security Breach Litig*., No. 23-md-03083, Exhibit 5 to Levis Decl.

The Paycom settlement was no accident. In true reverse auction fashion, Paycom's counsel sought out Mr. Federman because the pair had successfully run the same strategy within the *MOVEit* data breach before. Prior to settling the *Johnson* case, Mr. Federman filed an action in Maryland state court against Johns Hopkins, who was represented by the same counsel as Paycom. *See Turner v. The Johns Hopkins Health Sys. Corp.*, No. 24- C-23-002783 (Md. Cir. Ct.) ("*Turner*"); *see also* Exhibit 5 to Levis Decl. Mr. Federman quickly settled that case while the MDL transfer motion was pending, releasing claims asserted in the MDL. Lead counsel sought to enjoin that settlement, but the MDL court denied that request because the settlement was executed before the MDL transfer order. *See* Transcript of April 24, 2024 Status Conference, pp. 34 & 39-40, *In re MOVEit Customer Data Security Breach Litig*., MDL No. 3083, ECF No. 876, attached as Exhibit 7 to the Levis Decl.  However, the MDL Court admonished counsel and required future settlements of MDL claims proceed only through appointed lead counsel and the MDL court—an order Mr. Federman appears to have violated when he settled the *Johnson* case. *See id.* at p. 41.

To add another layer of irony to Intervenors' Motion, Mr. Federman is not the only member of the Losing Leadership Group to engage in an actual reverse auction. *See Hodges v. GoodRX Holdings Inc.*, No. 1:23-cv-24127, ECF No. 10 (S.D. Fla.) (order to show cause why Gary Klinger, Mr. Federman's supporting counsel, should not be sanctioned for filing and attempting to settle a tag-along action without alerting the Court of earlier, consolidated proceedings in which lead counsel had been appointed);  *Doe v. GoodRx Holdings Inc. et al.*, No. 3:23-cv-00501, ECF No. 152 (N.D. Cal.) (order to show cause why GoodRx should not be sanctioned for seeking to settle

a tag-along action without lead counsel appointed in the consolidated case and without altering the court).

### D.  The Notice Plan

Intervenors and the Losing Leadership Group fault the notice plan outlined in Exhibits 2 – 4 to Plaintiffs' Motion for Preliminary Approval of the pending class wide settlement (ECF Nos. 110-2 (Ex. 2 – Short Form Notice); 110-3 (Ex. 3 – Postcard Notice); 110-4 (Ex. 4 – Long Form Notice)), for not highlighting or providing details about the procedural status of the Oklahoma case. Mot. at 7. Intervenors contend this information is required for Settlement Class members "to evaluate which case most adequately represents their interests and has the best likelihood of success." Mot. at 8. This is a red herring, as that it not the function of class notice.

The purpose of a notice program is to provide Settlement Class Members with the information needed to evaluate the options available to them in connection the Settlement. *See* Section III.C., below. The categories of information required for that decision are identified in Fed. R. Civ. P. 23(c)(2). The Notice Plan proposed here satisfies Rule 23(c)(2) because it clearly and concisely provides the categories of information specified in plain, easily understood language. *See* Parks Decl., Exhibit 1 to Levis Decl. It even references the *Carr* Action to alert Settlement Class Members of the fact that the Settlement will also release claims asserted in that parallel action. *See* Short Form Notice, ECF 110-2 (the Settlement "would resolve the cases in the consolidated litigation, *In re Data Security Cases Against Nelnet Servicing, LLC*, No. 4:22-cv-3191, pending in the U.S. District Court for the District of Nebraska, including *Spearman, et al. v. Nelnet Servicing, LLC*, Case No. 4:22-cv-03191 (JMG) (JMD) (D. Neb.), and any related litigation involving the same facts and circumstances, including *Carr v. Oklahoma Student Loan Authority, et al.*, Case No. 5:23-cv-00099-R, before the U.S. District Court for the Western District of

Oklahoma ("*Carr*")."); Long Form Notice, ECF No. 110-4 ("This Notice explains the cases in the consolidated litigation, *In re Data Security Cases Against Nelnet Servicing, LLC*, No. 4:22-cv-3191, pending in the U.S. District Court for the District of Nebraska (the "Action"), including *Spearman, et al. v. Nelnet Servicing, LLC*, Case No. 4:22-cv-03191 (JMG) (JMD) (D. Neb.), and any related litigation involving the same facts and circumstances, including *Carr v. Oklahoma Student Loan Authority, et al.*, No. 5:23-cv-00099-R, before the U.S. District Court for the Western District of Oklahoma ("*Carr*"), the Settlement, your legal rights, what benefits are available, who is eligible for them, and how you can apply to receive your portion of the benefits if you are eligible."); *id.* at Question #5 (going through the history of the Nebraska litigation and Carr Action); *id.* at Question #15 ("Unless you exclude yourself, you remain a Settlement Class Member. That means you cannot sue, continue to sue, or be part of any other lawsuit about the Released Claims in this Action or any other action against the Settling Entities, including, but not limited to *Carr*.").

However, Because the *Carr* Action is fully subsumed within this case and the Settlement, as it arises from the same Data Breach, Settlement Class Members do not require any special Oklahoma-specific information to evaluate their options.

### E.  The Work of Interim Class Counsel

Intervenors repeatedly criticize Interim Class Counsel's adequacy without identifying any substantive deficiencies, such as an error in the pleadings, botched arguments on the motion to dismiss, or other litigation failure in representing the Class. They claim Interim Class Counsel did not conduct sufficient due diligence in negotiating the settlement, but as a consequence of refusing to participate in those negotiations, have no idea what documents, data, and information Interim Class Counsel considered. *See* April 4, 2024 Declaration of Christian Levis at ¶¶ 4-10, ECF No.

92-2; *see also* June 12, 2024 Declaration of Christian Levis at ¶ 14, *Carr* Action, ECF No. 110-1, attached as Exhibit 7 to Levis Decl.[18] And Intervenors claims that Interim Class Counsel failed to consider and incorporate plaintiffs represented by other counsel that had better damages fact (Mot. at 5, 14)[19] ignores the obvious: with 26 plaintiffs already in the case, representing 17 states, there simply was not a need for additional representatives.

### III.    <u>LEGAL ARGUMENT</u>

The Court's First Intervention Order sets forth the standard for intervention under Rule 24. ECF No. 98, at 3-8. Having already decided the issue once, the Court established clear evidentiary parameters that Intervenors must meet in order to justify filing a renewed motion. *Id*. at 8. As demonstrated below, Intervenors fail to carry their burden because this Motion, like the first one, does not "submit or point to any evidence" supporting their accusations of collusion or other misconduct by Interim Class Counsel, and instead relies exclusively on "conclusory statements speculating that such [conduct] occurred." *Id*. at 5

### A.    **Intervention is Not the Proper Vehicle to Object to the Settlement**

Intervenors' motion should be denied because their supposed dissatisfaction with the Settlement is not a valid reason to invoke Fed. R. Civ. P. 24. As this Court previously held: "[a]nyone who wants to object to the reasonableness of the settlement may do so in the ordinary course of business, as provided by Fed. R. Civ. P. 23(e)(5), if and when the Court preliminarily approves it. Attempting to scuttle the settlement before then is premature." ECF No. 115.

---

[18] It is exceedingly ironic that Intervenors criticize Interim Class Counsel for settling the case after motions to dismiss were complete when they were willing to settle the case before the J.P.M.L. even weighed in and well before a consolidated complaint was even filed.

[19] This requires suspending disbelief. "Cooperation" is a euphemism for attorneys' fees. The Losing Leadership Group is mad Interim Class Counsel did not "cooperate" with them, by including their plaintiffs in the consolidated complaint, because it means they will not get paid.

Intervenors renewed motion does not present any reason to deviate from this established practice as their basis for intervention turns entirely on features of the Settlement, namely the Settlement Amount and supposed failure of the Notice Plan to say enough about the *Carr* Action. *See* Section II, above. These collateral challenges to the Settlement itself, are objections—not reasons for intervention. *Looney v. Chesapeake Energy Corp.*, No. 2:15-cv-02108, 2016 WL 7638467, at *2 (W.D. Ark. Sept. 23, 2016) (denying objectors' motion to intervene where they "may preserve their interests by asserting their objections at the final approval hearing").

Intervenors cannot backdoor their way into a valid Rule 24 motion by challenging Interim Class Counsel's adequacy because their adequacy arguments are also based solely on the terms of the Settlement. The Court denied Intervenors' initial motion without prejudice for the limited purpose of proving evidence "to prove Plaintiffs do not adequately represent them on matters beyond the subject matter jurisdiction issue." First Intervention Order at 8. Attempting to capitalize on this language, Intervenors now claim that the $10 million Settlement Amount is "conclusive evidence" that Interim Class Counsel failed to represent their interest by engaging in a "reverse auction." Mot. at 5. However, Intervenors' motion fails to present any evidence of collusion among Interim Class Counsel and Defendants[20] and relies solely on the Losing Leadership Group's belief that they could have settled the case for more if appointed as support. *See Section* I; II.B., above. This hypothetical is not "proof" and fails to meet the evidentiary requirements previously set by this Court to renew Intervenors' motion. *See* First Intervention Order at 6-7. [21]

---

[20] *See* First Intervention Order at 5 (finding there was "[no] evidence indicating Plaintiffs colluded with Defendants (despite [Intervenors'] conclusory statements speculating that such occurred).")

[21] The failure to submit *any* evidence this second time around is even more egregious given the Courts' clear warning "extremely unlikely to grant a motion to intervene for the sole purpose of reopening issues already settled by this Court or for staying the Nebraska action" absent actual proof of Intervenors' claims. First Intervention Order at 8.

**B.  Intervenors' Challenge to the Settlement Amount is Meritless**

The Court's role in reviewing a negotiated class settlement is to "ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 934 (8th Cir. 2005). At the preliminary approval stage, "the court's focus is on whether a proposed settlement ***is within the range of possible approval*** due to an absence of any glaring substantive or procedural deficiencies." *Cullan & Cullan LLC v. M-Qube, Inc.*, No. 8:13-cv-172, 2016 WL 5394684, at *6 (D. Neb. Sept. 27, 2016) (internal citations and quotations omitted) (emphasis added). As Plaintiffs explained in their Preliminary Approval Brief, each of these requirements are met. *See* ECF No. 112. The Settlement resulted from arms-length negotiation among the Parties over several months, supervised for well-regarded mediator who is a formal federal magistrate judge. *See* Levis Preliminary Approval Decl. at ¶¶ 33-39, ECF No. 110. The Settlement Amount of $10 million is well within the range of possible approval, and exceeds the compensation obtained in many other data breach Settlements, including recent representative examples where members of the Losing Leadership Group are counsel:[22]

| TABLE 1 | | | |
|---|---|---|---|
| Case | Class Size | Represented By | Total Amount/ $Per Person |
| *Kostka v. Dickey's Barbecue Restaurants, Inc.*, No. 3:20-cv-03424-K (N.D. Tex.) (Executed: August 11, 2021) | 725,000 | John A. Yanchunis | $2.35 million/ $3.24 per person |
| *In Re: CaptureRx Data Breach Litig.*, No. 5:21-cv-00523 (OLG) (W.D. Tex) (Executed: February 4-10, 2022) | 2,420,141 | Gary M. Klinger | $4.75 million/ $1.96 per person |

---

[22] While these examples are illustrative, Interim Class Counsel can provide additional examples at the Court's request.

| | | | |
|---|---|---|---|
| *IN RE: Mednax Services, Inc., Customer Data Sec. Breach Litig.*, 21-MD-02994 (RAR) (S.D. Fla.) (Executed: April 5, 2024) | 2,712,790 | William B. Federman | $6 million/ $4.62 per person |
| *Sherwood v. Horizon Actuarial Servs., LLC,* No. 1:22-cv-01495 (N.D. Ga.) (Executed: December 19, 2023) | 4,386,969 | Gary M. Klinger | $8.73 million/ $1.99 per person |
| *Salinas v. Block Inc., et al.,* No. 22-cv-4823 (N.D. Cal.) (Executed: February 16-18, 2024) | 8,200,000 | William B. Federman | $15 million/ $1.83 per person |

Intervenors fail to present any evidence of fraud, collusion, or other "glaring" deficiencies in the Settlement. Instead, they claim that the $10 million Settlement Amount *on its own* "conclusively establishes" that Interim Class Counsel colluded with Defendants because, in their view, if they had been appointed to lead this case, they would have settled it for more. *See Section* II.B., above. This fails for at least the following reasons:

*First*, the Losing Leadership Group's views about the potential, hypothetical result, they may have been able to achieve if they were selected as interim class counsel is irrelevant. *See Hibler v. Santander Consumer USA, Inc.*, No. 13-1354, 2013 WL 12137716, at *5 (C.D. Cal. Nov. 21, 2013) (finding intervenor's assertion that "he could secure a larger settlement for the class" was "meritless because [i]ntervenor is arguing over an actual settlement by [p]laintiff, as compared to a hypothetical settlement by [i]ntervenor").

*Second*, although the Losing Leadership Group has failed to produce evidence as to why they believe Defendants "indicated" they may be willing to settle the case for more (*see* Mot. at 1, 5, 7, even if this were true, it still would not change the outcome. Whether the $10 million Defendants have agreed to pay now is reasonable turns on whether it is within the *range of*

17

potentially reasonable outcomes for this case. *See Lechner v. Mutual of Omaha Ins. Co.*, No. 8:18-cv-22, 2021 WL 424421, at *2 (D. Neb. Feb. 8, 2021) (approving settlement where plaintiffs showed "the amount of the settlement . . . is fair, reasonable, and adequate and the gross settlement [a]mount is within the range of reasonable settlements that would have been appropriate in this case"); *Keil v. Lopez*, 862 F.3d 685, 696 (8th Cir. 2017) (recognizing "the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate" . . . it simply must be "within the fair and reasonable range"). Even if Defendants had made a concrete *offer* to settle at the initial mediation for more than $10 million (and there is no evidence they did), it would still not render the $10 million Settlement before the Court unreasonable because it would remain within the range of reasonable outcomes as described above.

*Third*, Intervenors cannot use their early mediation as a sword and a shield: arguing that they could have obtained a better result, while concealing the facts needed to test their statements as "privileged." Courts are unanimous that a party who relies on supposedly privileged information to support their arguments waives that privilege. *Little v. Shell Expl. & Prod. Co.*, No. CV H-07-871, 2017 WL 4742917, at *27 (S.D. Tex. Aug. 18, 2017) (finding Federal Rule of Evidence 408 protections were waived by the party's "reliance on these materials" in their briefing); *Puget Soundkeeper All. v. Rainier Petroleum Corp.*, No. C14-0829JLR, 2017 WL 6515970, at *6 (W.D. Wash. Dec. 19, 2017) (finding by "relying on statements [] made during the mediation" the party "waived the privilege to the mediation communications"). Having weaponized their prior negotiations, Intervenors must turn over all documents and information relating to their early mediation to Interim Class Counsel so they can respond to those arguments. *See, e.g., United States v. Cote*, 456 F.2d 142, 144 (8th Cir. 1972) (explaining, when "privilege" is waived the party waives

not only the specific document but all "details underlying that information" which must "now [be] disclosed"); *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 732 (8th Cir. 2002) (finding implied waiver of privilege under Nebraska law and ordering "disclosure" of the information). Otherwise, these arguments must be stricken—along with the corresponding sections of Intervenors' motion—as they improperly seek to use privileged material while depriving Interim Class Counsel of an opportunity to fairly respond. *See Kirby v. Payless ShoeSource, Inc.*, No. 06-cv-11853 (GAO), 2008 WL 11511501, at *1 (D. Mass. Sept. 5, 2008) (granting motion to strike where plaintiff was "unable to challenge" defendants' argument "since discovery [on this issue] has been precluded by the assertion of the attorney-client privilege" and holding that the party cannot use the privilege "as both a sword and a shield"); *see also E.E.O.C. v. Hibbing Taconite Co.*, 266 F.R.D. 260, 272 (D. Minn. 2009) (explaining "remedy for [the] violation" of the "mediation privilege[,]" should one exist, is "suppression of the contested evidence.").

*Fourth*, Intervenors' attempt to make the $10 million Settlement Amount appear unreasonable by comparing it to different cases that settled for more on a per person basis should be rejected. *See* Mot. at 7, n.8. Unlike the examples in Table 1 above, which each involve several hundred thousand or millions of people, these cherry-picked examples are not comparable to the Settlement in this case because they concern much smaller classes.

| TABLE 2 | | |
|---------|---|---|
| **Case** | **Class Size** | **Total Amount/ $Per Person** |
| *Perry v. Bay & Bay Transportation Services, Inc.*, No. 22-cv-973 (D. Minn.) | 6,739 | $230,000/ $34.13 per person |
| *Mackey v. Belden, Inc.*, No., 4:21-cv-00149 (E.D. Mo.) | 15,334 | $865,000/ $0 guaranteed[23] |

---

[23] This is a claims-made settlement so there is no guaranteed amount. *See* p. 10, n.19, above.

| *Lutz v. Electromed, Inc.*, No. 21- cv-2198 (D. Minn.) | 46,438 | $825,000/ $17.76 per person |
| *Weisenberger v. Ameritas Mut. Holding Co.*, No. 4:21-cv-3156 (D. Neb.) | 95,644 | $850,000/ $8.88 per person |
| *Coleman v. BoysTown Research Hospital*, No. D01C118000816 (Douglas Ctny. Dist. Ct., Neb.) | 105,309 | $3,500,000/ $33.23 per person |

Presenting these smaller cases as comparable is misleading because the dollar value per class member generally declines as the size of the settlement class increases. *See, e.g.*, *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 943-45 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016) (explaining the "challenge, given the [large] size of the class" is that "even a modest per-class member payment could easily require a total settlement fund in the billions of dollars" which is why such settlements typically reflect a "very modest per-claimant sum"); *In re Washington Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1303 (9th Cir. 1994) (explaining, in contrast to "megafund" cases, where the "size of the class is relatively small" then the "individual recovery amount per Class member is relatively large"). While the defendants in *Perry* may have been willing to pay $34.13 per person given the less than 7,000-person class, it is unlikely they would pay the same amount if the class contained 2.5 million people. The per person amounts in the Table 2 cases are simply not relevant benchmarks and irrelevant to the reasonableness of the Settlement Amount here.[24]

---

[24] The cases Intervenors rely on are also distinguishable by their facts for the types of information they involve. For example, *Coleman* and *Lutz* involved breaches that compromised medical records—something universally recognized as among the most private and sensitive information about a person. *See Doe v. Regents of the Univ. California*, 672 F. Supp. 3d 813, 820 (N.D. Cal. 2023) ("Personal medical information is understood to be among the most sensitive information

**C.  The Notice Plan Adequately Informs Class Members about the Settlement**

Class action notice "need only satisfy the 'broad reasonableness standards imposed by due process.'" *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999) (quoting *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975)). Notice is adequate if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Petrovic*, 200 F.3d at 1153 (internal citations and quotations omitted). That is precisely what the Notice Plan proposed in Plaintiffs Motion for Preliminary Approval does here: it presents Settlement Class Members with the information they need to evaluate the Settlement and opt out or object to it if desired. *See* Preliminary Approval Brief, ECF No. 112. As explained by Justin Parks, Vice President in the Class Action Administration Division of A.B. Data, the Notice Plan was carefully designed to provide each of the categories of information required by Rule 23(c)(2) in clear, concise, easy to understand language. *See* Parks Decl. ¶ 10, attached as Exhibit 1 to the Levis. Decl.; *see also id.* ¶¶ 8-9 (identifying location in each of the Notice Documents where information required under Rule 23(c)(2) appears). This is consistent with multiple other court-approved notice plan's that Mr. Parks and A.B. Data have designed, including those approved in cases within this Circuit. *Id.* ¶¶ 5-7. The Notice Plan proposed here is adequate and should be approved for the same reasons.

As with their challenge to the Settlement Amount, Intervenors fail to identify a legitimate deficiency in the Notice Plan. Rather, they argue that Notice is inadequate because it does not include additional information (i.e., beyond what Rule 23(c)(2) requires) describing the procedural intricacies of *Carr* Action sufficient to allow Class members to choose which case better represents

---

that could be collected about a person.") . While *Perry* involved driver's license information, a category of data protected by federal law that comes with stiff statutory penalties of $2,500 per violation if disclosed without consent. *See* 18 U.S.C. § 2724(b).

their claims. Mot. at 7-8. This is a red herring. Class members are not being asked to vote for their favorite action, or to choose which one gets to proceed. They are being asked to evaluate the Settlement and their rights under that agreement. *See Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 191 (8th Cir. 1993) (explaining there are no notice issues when claimant has notice of the "terms of the proposed settlement", that it extinguishes all claims "related to" the same facts, and provides an "adequate opportunity to opt out"). The additional information Intervenors demand not only fails to answer this question, but risks misleading Settlement Class Members by creating false impressions about the potential outcome of the *Carr* Action, or the appearance their claims will still be represented in Oklahoma if the Settlement is approved—an impossibility since the claims asserted there will be extinguished.

Intervenors related argument that this information is necessary for Settlement Class Members to value their claims because: (a) punitive damages are available in Oklahoma, and (b) the *Carr* Action would only have increased in value over time (Mot. At 6, 13) fails for the same reason. The *Carr* Action is still early in discovery and faces significant risks going forward, including class certification and summary judgment. There is no guarantee plaintiffs there will be able to prove their claims, or that a jury will award punitive damages, let alone that the value of the case will continue to increase over time. Promoting these hypothetical benefits to Settlement Class Members in the Notice would not help them evaluate their options under the Settlement, it would only mislead them. *See Harvey v. Morgan Stanley Smith Barney LLC*, No. 18-cv-02835 (WHO), 2019 WL 9441672, at *2 (N.D. Cal. Sept. 5, 2019), *aff'd*, No. 19-16955, 2022 WL 3359174 (9th Cir. Aug. 15, 2022) (finding "any slight value for class members in listing [a parallel action] in the class notice . . . is substantially outweighed by the confusion it would cause" where "any statement about [that action]'s likely outcome would be highly speculative at best"); *see also*

*Lewis-Ramsey v. Evangelical Lutheran Good Samaritan Soc'y*, No. 3:16-cv-00026, 2017 WL 821656, at *7 (S.D. Iowa Jan. 10, 2017) (finding "inaccurate statements" in class notice regarding class members' potential recovery from the settlement could "mislead potential plaintiffs thereby discouraging them from opting in to the settlement"); *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1044 (9th Cir. 2019) (finding that a class notice that did not "inform[]class members of the existence of the other lawsuits" still provides "sufficient information about the settlement in this case" because Rule 23 does not require "such information about parallel litigation"). The Notice Plan, as a result, cannot be deficient for failing to contain the misleading information Intervenors' demand.[25]

### D. Intervenors Do Not Present Any Basis to Replace Interim Class Counsel

The Court should also deny Intervenors' motion to replace Interim Class Counsel with Mr. Federman because they have failed to present any evidence to warrant revisiting its prior holding. In denying Intervenors' first motion, the Court made clear that it had "appointed Lowey/SGT as interim class counsel to represent the putative class, including the Intervenors" and that "[r]eopening this issue wastes judicial resources and unduly delays the resolution of this action." *See* First Intervention Order at 8.

Nothing has changed. As this Court previously found, "Plaintiffs have diligently worked to progress the Nebraska action by filing an amended complaint after consolidation, defending against a motion to dismiss, and participating in two mediations." First Intervention Order at 5.

---

[25] Not surprisingly, Intervenors do not identify a single case, notice plan, or preliminary approval order requiring the information they demand here. Nor was Justin Parks of A.B. Data, with his more than 17 years of experience, aware of one *See* Parks Decl.¶¶ 4, 7-12, attached as Exhibit 1 to Levis. Decl.

The Settlement is the culmination of these efforts and a reasonable resolution to the case.[26]  Despite their outlandish claims, Intervenors' motion is still devoid of any proof of collusion among Plaintiffs and Defendants. Their speculation that the Settlement *must* be the result of a collusive reverse auction because they could have done better is just that—speculation.[27] This falls well short of presenting *evidence* that Interim Class Counsel failed to represent their interests, which is the only basis the Court allowed for Intervenors to renew their motion *See* First Intervention Order at 8.

Intervenors' criticism of Interim Class Counsel's work in the case is equally meritless. Tellingly, Intervenors do not identify any flaws in the Complaint, motion to dismiss arguments, or other substantive legal work involved in the representation of the Class. Rather, they point to things they suggest they would have done differently, like "consider[ing] [] other potential plaintiffs,"[28]

---

[26] Intervenors' claim that Interim Class Counsel were appointed "based off . . . misrepresentations they fed to the Court" is meritless. Mot. at 11. As described in Section I, above (and already acknowledged by the Court), Interim Class Counsel were appointed because of their skill and experience and have "diligently" pursued the Class's claims. Intervenors point to no actual misrepresentations made to the Court at any time. Their gripes about Interim Class Counsel's litigation strategy equally fails. The Court has already rejected that this is sufficient to show counsel is inadequate. *See* First Intervention Order at 4 (explaining Intervenors "need to point to something more than" a difference of opinion on "litigation strategy[.]") (internal citations omitted).

[27] Intervenors' claim that Interim Class Counsel should have done more diligence, or conducted more discovery, prior to negating the Settlement is particularly ironic given that they themselves participated in a mediation before the J.P.M.L. hearing, while cases were still being filed. *See* Section II.B., above.

[28] These are not faults or misrepresentations as Intervenors claim. Mot. at 11-12. There was no need to add to the already robust list of 26 plaintiffs included in the Amended Complaint, which included OSLA borrower that had properly served notice of their claims on OSLA. And while Interim Class Counsel strive to work cooperatively in every case, it is unclear how Intervenors expect them to have done better here when: (a) they repeatedly asked Mr. Federman to join the prosecution of this case and he refused (*see* Section II.A., above), and (b) were threatened, nonetheless, that he would create "problems" for them if they did pay his desired rate. *See* Section II.A., above.

24

or "work cooperatively and collaboratively" with not just their "own clients." Mot. at 11-12. But these quibbles, at best, reflect "[a] difference of opinion concerning litigation strategy" that are unrelated to Interim Class Counsel's adequacy, the reasonableness of the Settlement, or outcome in this case. *Jenkins by Jenkins v. State of Mo.*, 78 F.3d 1270, 1275 (8th Cir. 1996).

## IV.    <u>CONCLUSION</u>

The Court was clear the first time that it was unlikely to reconsider Intervenors' Motion unless specific conditions were met. *See* First Intervention Order at 8 ("The undersigned notes, however, that the Court is extremely unlikely to grant a motion to intervene for the sole purpose of reopening issues already settled by this Court or for staying the Nebraska action."). Having failed to present evidence demonstrating collusion, or otherwise proving that Interim Class Counsel failed to represent their interests, Intervenors' Motion should be denied with prejudice.

Dated: September 25, 2024

Respectfully submitted,

*/s/Christian Levis*
Christian Levis
Amanda G. Fiorilla
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
clevis@lowey.com
afiorilla@lowey.com

Anthony M. Christina
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
achristina@lowey.com

Ian W. Sloss
Johnathan Seredynski
Steven L. Bloch
**SILVER GOLUB & TEITELL LLP**

One Landmark Square, Floor 15
Stamford, CT 06901
Tel: (203) 325-4491
isloss@sgtlaw.com
jeredynski@sgtlaw.com
sbloch@sgtlaw.com

*Interim Class Counsel*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(d)(3)</u>

I hereby certify that this memorandum of law (the "Brief") complies with the word-count limit described of Local Civil Rule 7.1(d)(1)(A). I relied on the word count feature of the word-processing system, Microsoft Word, Version 2308, used to prepare the Brief. The actual number of words in the Brief, including all text (the caption, body, headings, footnotes, and quotations), is 10,430 words.

I declare pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

<u>/s/ Christian Levis</u>
Christian Levis

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 25, 2024, a copy of the foregoing document was filed electronically with the U.S. District Court for the District of Nebraska and served on all counsel of record through the CM/ECF system.

*/s/ Christian Levis*
Christian Levis
